UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JEFFREY WHITNEY,
     Plaintiff,

v.                      CIVIL ACTION NO. 14-40066-LTS

NBC OPERATING, LP,
and ADRIENNE SANTOS,
     Defendants.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#54)

KELLEY, U.S.M.J.

     Defendants filed a Motion for Summary Judgment (##54, 55, 56), Plaintiff opposed (##63, 64), and Defendants replied (##66, 67). For the reasons set forth below, I recommend that Defendants' Motion for Summary Judgment be ALLOWED on all counts.

## I. **Facts**

     The following facts are undisputed, except where indicated. Plaintiff Jeffrey Whitney lives in Worcester, Massachusetts. (##55, 64 at ¶ 1.)  Defendant NBC Operating, LP[1] is a corporation with offices in Framingham, Massachusetts, in the business of merchandising for TJ Maxx and Marshalls stores. (##55, 64 at ¶¶ 2, 3.)  Defendant Adrienne Santos (who is female) worked for NBC as a planning manager during 2010-2013. (##55, 64 at ¶ 10; ##64, 66 at ¶ 85.)

     In January 2010, Plaintiff was hired by NBC to be in a training program known as PASE. (##55, 64 at ¶ 9.) PASE is the first step on a well-defined career path; after finishing training, successful employees are promoted to the position of allocation analyst, then senior allocation

---

[1] The original complaint was brought against "The TJX Companies, Inc. and Adrienne Santos." (#1.) Plaintiff amended the complaint to name "NBC Operating, LP" as the corporate defendant. (#32.)

analyst, then associate planner. (##55, 64 at ¶¶ 5, 6.) The ultimate goal is that employees will be promoted into one of NBC's two divisions as Planner Managers or Associate Buyers. (##55, 64 at ¶¶ 4, 7, 8.)  After completing the PASE training, Plaintiff received the first two promotions on this path, in June 2011 and January 2012. (##55, 64 at ¶ 38; ##64, 66 at ¶¶ 86-88.)  Plaintiff received overall performance ratings of "meets expectations" at annual evaluations in 2010, 2011, and 2012. (##55, 64 at ¶¶ 26, 28, 30.)  In 2011 and 2012, Plaintiff's evaluations, from manager Mia Decarolis, indicated that Plaintiff needed to visit stores more often and listed "clear development needs" in at least one subcategory. (##55, 64 at ¶¶ 29, 30.)

Defendant NBC had a policy against sexual harassment, including a grievance procedure, and Plaintiff was familiar with both. (##55, 64 at ¶¶ 11-13.)  In early 2011, Plaintiff reported to the Associate Relations Department that his coworker Patricia Lituri had subjected him to sexual harassment. (##55, 64 at ¶ 40.)  After his complaint, Lituri's conduct stopped. (##55, 64 at ¶ 41.) Defendant NBC also organized employee task forces to investigate retention rates of under-represented employee groups. (##64, 66 at ¶ 102.)  Plaintiff was appointed to a task force focusing on retention rates of male employees; he participated on it from 2012 until he ended his employment at NBC. (##64, 66 at ¶¶ 102, 103.)  Through the task force, Plaintiff understood that male retention rates at NBC were a problem, and that male employees were being "pushed out."[2] (##64, 66 at ¶ 102.)

During the past 10 years, no other associate from the same department as Plaintiff or with an identical or similar job title has filed a lawsuit or agency charge of sexual discrimination or harassment against NBC or Santos. (##55, 64 at ¶¶ 14, 74.)  Most of NBC's vice presidents are

---

[2] Plaintiff recalls surveying some male employees about their experiences in mid-2012, but Defendants deny that a survey happened at this time. (##64, 66 at ¶ 103.)

men, including the one who oversaw Plaintiff's department. (##55, 64 at ¶ 15.) Santos has

recommended promotion of other male employees. (##55, 64 at ¶ 77.)

## Harassment from Defendant Santos

In or around September 2012, Plaintiff received a lateral transfer to the women's

sportswear department, one of the "biggest" and most "prestigious" departments in the company.

(##55, 64 at ¶ 39; ##64, 66 at ¶ 89.) Between September 2012 and March 2013,[3] Plaintiff claims

the department supervisor, Adrienne Santos, harassed him by commenting that he "needed to be

'more of a cheerleader,'" that he was "not 'girly enough,'"[4] that he should "leave his

employment and go open a gym," that he needed to "chime in" and "be one of the girls" when

"girl chat" was happening, and that he should be a "personal trainer." (##55, 64 at ¶ 43; ##64, 66

at ¶¶ 90, 92-95.) Santos recounted telling all her associates they "had to be a cheerleader of their

business, meaning advocate for" their products. (#55 at ¶ 47.)[5] Santos also admitted telling

Plaintiff he should open a gym, because she knew he did personal training. (##55, 64 at ¶ 48.)

Plaintiff further reported that Santos would "'baby' the female employees by being overly

supportive of [their ideas and opinions] but would roll her eyes at the Plaintiff [when he talked

about business] and would either ignore or respond to his statements in a negative [and

unconstructive] manner." (##55, 64 at ¶ 43; #64 at ¶ 91.) Defendants deny these allegations.

(#66 at ¶ 91.)

---

[3] Plaintiff indicated in the MCAD charge document and his initial complaint that the harassment began "in or about" March 2013, but changed the start date to September 2012 in his amended complaint. (##55, 64 at ¶¶ 53-54.) Defendants have disputed Plaintiff's alleged dates, relying on the earlier allegations of March 2013. For purposes of this motion, it is assumed that Defendant Santos' alleged negative treatment of Plaintiff began in September 2012. (#64, 66 at ¶ 90.)
[4] Defendants dispute that Santos ever made this comment. (#66 at ¶ 92.)
[5] Plaintiff disputes this characterization. (#64 at ¶ 47.)

3

Plaintiff understood all these comments to be "based upon his sex/gender" and "suggesting that the Plaintiff, as a male, did not belong working in the fashion business" but rather "that the Plaintiff would be better suited to pursue a career that was male appropriate such as a personal trainer." (#32 at ¶¶ 5, 12.)  Defendants deny that Santos intended these as comments on Plaintiff's sex or gender. (##64, 66 at ¶¶ 90-95.)  Santos referred to NBC as a "woman's business." (#64 at ¶ 51.)  Defendants characterize this remark as meaning the "women's sportswear division" was "the women's side of the business," which Plaintiff disputes. (#55 at ¶ 51.)  Additionally, Santos excluded Plaintiff from meetings. (##55, 64 at ¶¶ 49, 50, 68; ##64, 66 at ¶ 130.)  Plaintiff asserts that these were department meetings that he would ordinarily attend. (#64 at ¶¶ 49, 50, 130.)  Defendants, however, say that Santos was holding individual meetings with other associates that did not concern Plaintiff.[6] (#55 at ¶¶ 49, 50; #66 at ¶ 130.)

Plaintiff states that he visited Alana Ingham in the Associate Relations Department on numerous occasions beginning at the end of 2012 to complain about Santos' conduct. (#64 at ¶ 97.)  He told her about "[t]he harassing remarks that I would get, the girly talk, the cheerleader comments, how I thought it was unprofessional that I would be… compared to girls or women… stuff like – small little harassment complaints." (#64, exhibit 43 at 280.)  Defendants deny that Plaintiff complained before March 2013, or that Plaintiff told Ingham the conduct was gender-based. (#66 at ¶¶ 97-100.)  The record does not indicate that Ingham responded to those complaints, but she told Plaintiff to talk to Santos himself. (##64, 66 at ¶¶ 98, 105, 106.)  Plaintiff asserts that he did talk to Santos, to no avail; Defendants dispute this. (##64, 66 at ¶ 99.)

---

[6] Plaintiff disputes this but cites no countervailing factual information. (#64 at ¶ 50.)

**Development Plan**

Despite Santos' behavior, by March 2013, Plaintiff believed he was performing well and was ripe for promotion. (##55, 64 at ¶ 34.)  At that time, his direct manager was Abraham Landau, a man, and Santos was his department supervisor. (##55, 64 at ¶ 32.)  Landau described Plaintiff's performance during this time as "on the low end of good" or "the lower side" of "meets expectations," and said he was not ready for a promotion. (#55 at ¶ 33.)  Plaintiff disputes this; he remembers Landau telling him that he was performing well, and believed he was chosen to join a focus group because of his "strong leadership quality." (#64 at ¶ 33.)  His sales were strong. (##64, 66 at ¶¶ 116, 117.)[7]

On March 18, 2013, Plaintiff was called to a meeting with Landau and Santos in which he anticipated he would receive a promotion. (##64, 66 at ¶ 118.)  Instead, he received a "development plan," detailing improvements he needed to make in his job performance. (*Id.*)  Plaintiff asserts that the development plan was solely Santos' decision. (#64 at ¶¶ 57-59.)  Defendants dispute this, citing deposition testimony of both Landau and Santos explaining that they discussed Plaintiff's performance and collaborated in the decision to create the development plan. (#55 at ¶¶ 57-59.)  Plaintiff remembers that in the meeting, Santos was "aggressive," "yelled" at Plaintiff and "made him feel worthless," reprimanded him for staying in the associate planner position for one year, and told him his road would be "incredibly rocky" and he had four months to "shape up or ship out." (#64 at ¶¶ 121-23.)  Defendants deny the aggressive tone and all comments except "shape up or ship out." (#66 at ¶¶122, 123.)  Plaintiff disagreed with the development plan because he believed his sales were high and he was visiting stores enough.

---

[7] Plaintiff believes that sales were the primary tool for evaluation; Defendants dispute this. (##64, 66 at ¶ 116.)

(#64 at ¶ 120.)  Defendants dispute this, noting that sales were not at issue in the development plan. (#66 at ¶ 120.)  Afterwards, Plaintiff remembers that Landau apologized for Santos' demeanor and aggressive behavior. (#64 at ¶ 96.)  Defendants deny that this happened, and Landau has no memory of it. (#66 at ¶ 96; #55, exhibit 28, at 66.)

Plaintiff believed that the development plan he received was a form of discipline. (#64 at ¶¶ 17-25, 60-63, 119.)  Defendants reject this contention. (#55 at ¶¶ 17-25, 60-63; #66 at ¶ 119.)  Defendants' written "Corrective Action Policy" ("CAP") does not explicitly list a development plan as a form of discipline, although Plaintiff believes it matches the CAP's definition of discipline. (##55, 64 at ¶¶ 16, 23-24; ##64, 66 at ¶ 119.)  Managers were not required to partner with the Associate Relations Department when assigning development plans to employees, as they were with some other forms of discipline.[8] (##55, 64 at ¶¶ 17, 23, 24.)  Defendants assert that Plaintiff did not receive a "performance improvement plan" or any of the documents described in the CAP, although Plaintiff notes that his written development plan was included in his personnel file, as the CAP requires. (##55, 64 at ¶¶ 18, 44.)  Defendants assert that development plans are "informal guidance documents" to help employees meet their goals, and that poor performance reviews are not a prerequisite. (#55 at ¶¶ 19-20; #66 at ¶120.)[9]  Santos had been issued a development plan at one point in her career, and she also assigned a development plan to a female employee, Christine Taranto, at a point when Ms. Taranto had a low performance rating. (##55, 64 at ¶¶ 21-22, 76.)  Santos had no authority to terminate employees. (##55, 64 at ¶ 45.)

---

[8] Plaintiff disputes this, noting that the policy states that human resources' involvement is required only for employee termination. (#64 at ¶ 24.)

[9] Plaintiff disputes this, but cites no countervailing factual information. (#64 at ¶¶ 19-20.)

Within two days after the meeting with Landau and Santos, Plaintiff visited Alana
Ingham in the Associate Relations Department again to complain about Santos' behavior. (##55,
64 at ¶ 64; #64, exhibit 44 at 281; ##64, 66 at ¶ 101.)  Santos was not aware that Plaintiff had
complained about her; neither Plaintiff nor Ingham informed her. (##55, 64 at ¶¶ 65-67; #66 at ¶
126.)  However, after Plaintiff spoke with Ingham, he observed that Santos had a "more
aggressive nature," made harassing comments more frequently, and excluded him from meetings
that he formerly would regularly attend.[10] (##55, 64 at ¶ 68; #64 at ¶¶ 126, 129, 130; #64, exhibit
44 at 283.)[11]  She encouraged Plaintiff to resign, saying "I don't see you being here" and "I think
maybe you should consider going elsewhere." (##64, 66 at ¶ 110.)  Plaintiff remembers Santos
saying that he should "just be a professional trainer" and that she did not see him continuing to
work at NBC. (#64 at ¶¶ 124, 125.)[12]  Ingham encouraged Plaintiff to talk with Santos about
these difficulties. (##64, 66 at ¶¶ 98, 106; #64, exhibit 44 at 285.) She also told Plaintiff that he
could "deal with it" or resign from his position, which he did not want to do. (#64 at ¶¶ 107, 108,
110.)  Defendants deny that Ingham said this. (#66 at ¶¶ 107, 108, 110.)  Ingham also scheduled
a follow-up meeting with Plaintiff, but he resigned before the meeting was held, less than one
week after he first received the development plan. (##55, 64 at ¶¶ 69, 70; ##64, 66 at ¶¶ 109,
131.)

Plaintiff felt that Santos' comments and conduct targeted him as a man, and he found
them offensive. (##55, 64 at ¶ 79.)  In general, Plaintiff believed that NBC treated him fairly
until September 2012, and Santos was the only manager from whom he felt harassment. (##55,

---

[10] Defendants deny that Santos did this. (#66 at ¶¶ 126, 127.)
[11] Santos denies that this happened. (#66 at ¶¶ 126, 127, 129, 130.)
[12] Defendants deny that Santos made these comments. (#66 at ¶¶ 124, 125.)

64 at ¶¶ 36, 37, 42.)  Santos never made sexual advances or comments about sexual activity to Plaintiff. (##55, 64 at ¶ 52.)  During the time he worked for Defendant NBC, Plaintiff posted pictures of a sexual nature on social media, such as pictures of himself naked or in close-fitting bathing suits. (##55, 64 at ¶¶ 80-84.)  He also posted suggestive comments and movie quotes. (##55, 64 at ¶ 82, 84.)  One Instagram picture features Plaintiff and Santos with female coworkers on a boat, tagged "#boatsnhoes," a movie quote. (##55, 64 at ¶ 84.)  There is no evidence that anyone from NBC saw these pictures or comments. (##55, 64 at ¶¶ 80-84.)  Plaintiff also testified that while he would find these types of images and communication offensive in a professional setting, he did not feel they were problematic outside work. (##55, 64 at ¶ 79.)

### Denial of Promotion

A female associate, Tatiana Kidd, received the promotion that Plaintiff was expecting to receive. (##64, 66 at ¶ 111.)  Plaintiff asserts that he was "mentoring and training" Kidd before the promotion, and that Kidd was less experienced than Plaintiff, worked in a smaller department, made significant mistakes, and had lower sales. (##55, 64 at ¶ 46; ##64, 66 at ¶¶ 112-15.)  Defendants dispute this, noting that Kidd was not similarly situated with Plaintiff: she worked in a different department, had a different manager and was evaluated on her own merits. (#55 at ¶ 46; #66 at ¶¶ 111, 112.)  They contend that Plaintiff's opinion of Kidd's performance was not relevant to the promotion decision. (#66 at ¶ 113.)  Finally, Defendants point out that Kidd actually sought the promotion, whereas Plaintiff simply believed he was "in line" for it. (#66 at ¶ 111.)  Although Santos could make recommendations, she was not personally

responsible for promotion decisions and Plaintiff was not aware who did make those decisions. (##55, 64 at ¶¶ 46, 77.)

## Resignation

Plaintiff resigned on March 25, effective April 5, 2013. (##55, 64 at ¶ 70; ##64, 66 at ¶ 131.)  He alleged that he was constructively discharged because Santos' conduct had made his work environment intolerable. (##55, 64 at ¶ 71.)  He became more uncomfortable and anxious, and had nightmares and drank more. (#64 at ¶ 128.)  Defendants deny that they caused Plaintiff's stress. (#66 at ¶ 128.)  Plaintiff believes that another associate named Macheila Murphy, who was younger and less experienced than he was, took over his job duties and was eventually promoted. (#64 at ¶¶ 132-134.)  Defendants deny that Murphy took over Plaintiff's position or that she was promoted. (#66 at ¶¶ 132-134.)[13]  Santos also created a final performance review of "meets expectations" for Plaintiff, but he never received it because he resigned. (##55, 64 at ¶¶ 31, 72-73.)

## Case History

On December 1, 2013, Plaintiff filed a complaint with the Massachusetts Commission against Discrimination (MCAD). (##55, 64 at ¶ 53; #55, exhibit 29.)  Plaintiff removed the case to court by filing a complaint with this Court on May 15, 2014, charging his former employer and Santos with gender discrimination, harassment, and retaliation under Title VII of the 1964 Civil Rights Act and under Mass. Gen. Laws c. 151B, against both NBC and Santos. (#1.)

Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss plaintiff's complaint with prejudice. (#15 at 1.)  Plaintiff opposed the motion to dismiss (#18) and moved for leave to

---

[13] Santos initially testified that Murphy was Plaintiff's replacement, but corrected her deposition transcript to reflect that it was actually Christine Taranto. (#66 at ¶ 132.)

amend his complaint to cure issues raised in Defendants' motion to dismiss, specifically by removing Title VII claims against Santos and adding factual allegations to support Plaintiff's claim. (#19.)  The Court allowed the motion for leave to amend (#31) and, on the undersigned's recommendation, denied the motion to dismiss. (##34, 37.) In the Amended Complaint, Plaintiff alleged sex/gender discrimination, harassment, and retaliation under Title VII of the 1964 Civil Rights Act against NBC, (Counts I, II, III); sex/gender discrimination, harassment, and retaliation under Mass. Gen. Laws c. 151B against NBC, (Counts IV, V, VI); and sex/gender discrimination, harassment, and retaliation under Mass. Gen. Laws c. 151B against Santos (Counts VII, VIII, and IX). (#23.)

## II. <u>Summary Judgment Standard</u>

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.*, 394 F.3d 40, 42 (1st Cir. 2005) (internal quotation marks and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). The burden then shifts to the non-moving party; in an employment discrimination case, a plaintiff who wishes to withstand summary judgment must "muster facts sufficient to support an inference of discrimination. He cannot rely exclusively on bald

assertions, unsupported conclusions, or optimistic surmises." *Bennett v. Saint-Gobain Corp*., 507 F.3d 23, 30 (1st Cir. 2007) (citing *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

When deciding whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (further internal quotation marks omitted)). Facts of record asserted by the moving party will be deemed admitted, unless controverted by the opposing party. L.R. 56.1.

### III. Legal Argument

A. <u>Count I: Sex/Gender Harassment under Title VII against NBC</u>

Title VII of the Civil Rights Act prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's... sex..." 42 U.S.C. § 200e-2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986). However, Title

VII is not "a general civility code for the American workplace," and does not protect employees from every difficult work situation. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Like its counterpart the Age Discrimination in Employment Act, Title VII requires some showing of discriminatory conduct beyond "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suarez v. Pueblo Intern., Inc.*, 229 F.3d 49, 54 (1st Cir. 2000).

Under the burden-shifting framework for discrimination claims, Plaintiff has the duty to set out a *prima facie* case. He must prove 1) membership in a protected class, 2) that he has suffered an adverse employment action, 3) discriminatory animus, and 4) causation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Gerald v. Univ. of P.R.*, 707 F.3d 7, 24 (1st Cir. 2013). If he succeeds, Defendant must then provide a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 803. At the final stage of the analysis, Plaintiff assumes the burden of showing that Defendant's reasons are mere pretext, and that its true motive was discrimination. *Id.* at 804.

### 1. Title VII Vicarious Liability of NBC for Santos' Actions

NBC assumed vicarious liability for Santos' actions while she supervised Plaintiff. "Under federal law, an employer is vicariously liable when a supervisor creates a hostile work environment, subject, however, to a possible affirmative defense, commonly known as the *Faragher/Ellerth* defense, based on the relevant Supreme Court cases." *Newell v. Celadon Sec. Servs., Inc.,* 417 F. Supp. 2d 85, 92 (D. Mass. 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).  It is undisputed that Santos was Plaintiff's supervisor. (#55 at ¶ 56; #64 at ¶ 89.)

12

To escape liability, NBC would have to show both "that it 'exercised reasonable care to prevent and correct promptly' the harassment," and that Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Noviello v. City of Boston*, 398 F.3d 76, 94-95 (1st Cir. 2005) (internal citation omitted). There is no evidence supporting the latter: from the facts of record, it does not appear that NBC offered any protective opportunities or that Plaintiff unreasonably failed to take care. Because NBC fails the second part of the test, there is no reason to examine the first. The undisputed facts show that NBC is liable for Santos' actions, so they are analyzed together below.

### 2.  Plaintiff's Prima Facie Case

Plaintiff has described himself as a member of a protected class, male employees of Defendant NBC. He alleges three adverse employment actions, all in March 2013: denial of promotion, issuance of a development plan, and constructive discharge.

### a.  Denial of promotion

Plaintiff has established that he was denied a promotion in March 2013, while a less-qualified woman, Tatiana Kidd, was promoted. To show that he was wrongly denied a promotion, Plaintiff "must prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 32-33 (1st Cir. 1990) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, there is no indication that Plaintiff applied for a promotion, only that he believed that he was in line for promotion and did not need to submit a formal application. (##55, 64 at ¶ 46.) Some courts have held that "an employee is not required to formally apply for a position when opportunities are not posted or otherwise made known to employees, as it is impossible to require an employee to apply for a position he did not know about." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 780 (D. Md. 2010) (citing *Williams v. Giant Food, Inc*., 370 F.3d 423, 431 (4th Cir.2004)). For purposes of this motion, it is assumed that Plaintiff was automatically considered for the position without having to apply, even though Kidd apparently did submit some form of application. (#66 at ¶ 111.) The facts support the inference that Defendant acted out of discriminatory animus, and that this animus caused Plaintiff to be denied the promotion.

With Plaintiff having established a *prima facie* case, the burden then shifts to Defendant NBC to articulate its reasoning. Plaintiff's prior performance reviews had been solid, but his manager Abraham Landau testified that as of January-March 2013, Plaintiff was not "promotable" because his performance "was not at a point where it deemed promotion." (#55, exhibit 28, at 23.) He "didn't show the leadership or the planning ability to be a manager." (*Id.* at 24.) Landau observed that Plaintiff "would not necessarily get jobs completed that had to do with his actual role in a timely… thorough… or… accurate manner." (*Id.* at 27.) Other managers who supervised Plaintiff attest that they agree with the criticisms in Plaintiff's development plan. (##55, exhibit 33 at ¶¶ 7-8 (Mia Decarolis); #55, exhibit 34 at ¶¶ 6-7 (Julie Twomey).) Santos' supervisor Sara Shaughnessy, who attended meetings with Plaintiff, also reviewed and approved the development plan. (#55, exhibit 4 at ¶ 7.) Shaughnessy identified specific areas of improvement for Plaintiff: "I wanted him to demonstrate a stronger ability to drive the business

at a strategic level by doing things like identifying trends, opportunities, and challenges, and

coming up with solutions… I believe that Mr. Whitney could have been more clear, concise, and

articulate in his communications…" (*Id.* at ¶ 6.) In short, Defendant shows ample evidence that

Plaintiff's performance did not merit a promotion.

Plaintiff then must raise facts showing that these reasons are a pretextual cover for NBC's

true motive of discrimination. An employee may not merely "'impugn the veracity' of [the]

decision-maker; rather, the employee must elucidate specific facts enabling [a] jury to conclude

that the reason was not only a 'sham' but one 'intended to cover up the employer's real

[discriminatory] motive.'" *Ponte v. Steelcase Inc.,* 963 F. Supp. 2d 55, 62 (D. Mass. 2013) *aff'd*,

741 F.3d 310 (1st Cir. 2014) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st

Cir.1991)). Here, Plaintiff can only point to his own opinions of Kidd to argue that she did not

merit a promotion, and that he was more deserving. All of his facts come from his own

depositions and affidavit. (#64 at ¶¶ 46, 112-117.) As Defendants note, Plaintiff did not

supervise or evaluate Kidd. (#66 at ¶ 113.) The record does not contain any evidence about

Kidd's actual performance reviews. Plaintiff also relies on his own opinion of his performance:

various people told him he was doing well, he believed that his sales were high, and he could not

have fallen short on store visits because there was no official quota. (#64 at ¶¶ 57-58, 116-17,

120.) As detailed above, some of those same people also felt he had room for improvement. He

has no factual answer to Defendant's contention that Kidd was not similarly situated. Therefore,

Plaintiff has not presented any specific facts that could raise a genuine issue that Defendant NBC

had discriminatory motives for promoting Kidd over him.

Plaintiff's participation on the task force is likewise insufficient to raise an issue of discriminatory animus. Plaintiff admits that most of the vice presidents, including the one who oversaw his department, were male. (##55, 64 at ¶ 15.) He acknowledges that Landau received a promotion. (##55, 64 at ¶ 55.) These successes of other men at NBC cut against the idea that the company culture was prejudiced against Plaintiff because he was a man. Also, the task force's existence suggests that NBC wanted to *increase* its hiring, promotion, and retention of male employees, exactly the opposite of what Plaintiff alleges.

Additionally, Plaintiff's allegations of discrimination center on Defendant Santos' attitude towards him. But Santos did not make the decision not to promote the Plaintiff—senior management did. (#64, exhibit 46 at 27.) *Cf. Bennett*, 507 F.3d 23 (summary judgment for employer affirmed, where individual who made problematic comments had nothing to do with employee's discharge). Defendants also presented uncontroverted evidence that Santos had recommended promotion of other male employees, weakening Plaintiff's argument that company culture was to push men out. (##55, 64 at ¶ 77.) Finally, Santos completed a performance review of Plaintiff after he had resigned, and assigned him the same rating as before: "meets expectations," with specific criticisms that tracked the recommendations in the development plan.[14] (##55, 64 at ¶ 72; *see generally* #55, exhibits 32 and 36.) Because Plaintiff cannot raise a genuine factual dispute on pretext, this claim fails.

b.   Development plan

Plaintiff asserted in his deposition that the development plan was a form of discipline, and he interpreted company policy in line with that view. (*See, e.g.*, #64 at ¶¶ 17-25, 60, 62-63,

---

[14] Plaintiff never received a copy of this performance review because it was completed after his last day at work. (#64 at ¶ 72.)

75.) Defendant disagrees, and cites more evidence. (#55, exhibits 4, 17, 34, 35; #64, exhibit 46 at

101.) Alayna Ingham stated that even employees with the highest category of performance

reviews could get development plans. (#55, exhibit 17 at ¶ 6.) Santos received a development

plan herself, at a time when her performance review was "exceeds expectations." (##55, 64 at ¶

21.) The fact that Plaintiff characterizes the development plan as discipline does not make it so.

Plaintiff states – based solely on his own beliefs – that the development plan kept him

from getting the promotion he had anticipated, and therefore had consequences for his

employment. (##55, 64 at ¶ 118.) However, as discussed above, record evidence from Abraham

Landau, Julie Twomey, and Mia Decarolis shows that it was Plaintiff's job performance, not the

development plan or Santos, holding him back from promotion. Other employees, including

Christine Taranto and Santos, were promoted after having received development plans. (#55 at

¶¶ 21, 22, 76; #66 at ¶ 134). These facts do not lead to an inference that Plaintiff's denial of

promotion was a negative consequence of his development plan.

Because the development plan at issue here had no harmful results for Plaintiff's job

other than his personal disappointment, it is not an adverse employment action. Multiple courts

have held as a matter of law that written criticism, similar to the development plan in this case,

does not constitute a materially adverse action unless negative employment consequences flow

from it. *See Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 570 (2nd Cir. 2011)

("criticism of an employee… [is] necessary to allow employees to develop, improve, and avoid

discipline" and not adverse) (internal citations omitted); *Hussey v. New York State Dep't of*

*Law/Office of Atty. Gen*., 933 F. Supp. 2d 399, 410 (E.D.N.Y. 2013) ("counseling memo" not

adverse where there were no effects on employee's work conditions); *Cozzi v. Cnty. of Marin*,

787 F. Supp. 2d 1047, 1061 (N.D. Cal. 2011) ("performance improvement plans" not adverse without material effects on terms and conditions of employment); *Aldarondo-Lugo v. Santiago-Diaz*, 537 F. Supp. 2d 309, 318-19 (D.P.R. 2008) ("letter of intent to effect corrective action, without any further action being taken" not adverse); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429–30 (S.D.N.Y. 2006) ("negative evaluations… without any accompanying adverse consequences" not adverse). This is true even where the written criticism is punitive in nature. *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015) (reprimand not materially adverse "when it did not result in any change in the terms or conditions of [the] job."); *Jones v. Dole Food Co.*, 827 F. Supp. 2d 532, 550 (W.D.N.C. 2011) *aff'd*, 473 F. App'x 270 (4th Cir. 2012) (written warning, without more, not adverse); *Young v. St. James Mgmt., LLC*, 749 F. Supp. 2d 281, 297 (E.D. Pa. 2010) (citing *Haynes v. Level 3 Commc'ns*, LLC, 456 F.3d 1215, 1224 (10th Cir.2006)) ("formal reprimands [noted] in an employee's personnel file" adverse "only if they significantly change an employee's employment status").

Even assuming *arguendo* that the development plan was punitive, Defendants have explained adequately their decision to implement it, for reasons other than Plaintiff's sex or gender. Plaintiff's managers Mia Decarolis, Abe Landau, and Julie Twomey all agreed with the recommendations in the development plan. (#55, exhibits 33, 34, 35.) Santos also gave development plans to two other employees, Christine Taranto and Joel Legare. (##55, 64 at ¶¶ 22, 62, 76.) Having articulated a legitimate non-discriminatory rationale for their actions, the burden shifts back to Plaintiff to show that the reasoning was pretextual.

As with the promotion, Plaintiff has developed no facts against NBC, other than his own personal suspicions, which could indicate that NBC truly intended to discriminate. Because Plaintiff has not carried his burden of showing pretext, this claim cannot survive.

c.  Constructive discharge

Plaintiff states that after he received his development plan and complained to Ingham, Santos' treatment of him became so harsh that he was forced to resign. To support a claim of constructive discharge, a plaintiff must show even more severe harassment than is required to prove a hostile work environment. *Patrick v. Jansson Corp.*, 392 F. Supp. 2d 49, 55 (D. Mass. 2005) (citing *Hernandez-Torres v. Intercont'l Trading, Inc.*, 158 F.3d 43, 48 (1st Cir. 1998)). The working conditions must be "so difficult or unpleasant that a reasonable person in [Plaintiff's] shoes would have felt compelled to resign." *Patrick*, 392 F. Supp. 2d at 55 (quoting *Marrero*, 394 F.3d at 28 (internal citation omitted)). Cases setting out examples of constructive discharge include *Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 731 (1st Cir. 1999) (demotion, assignment to a notoriously bad cubicle, lack of computer access, change in duties, a requirement that the employee work on his vacation time, and threatened assault by a supervisor), and *Flores-Suarez v. Turabo Med. Ctr. P'ship*, 165 F. Supp. 2d 79, 92 (D.P.R. 2001) (plaintiff denied access to employee locker, her work schedules were changed without notice, her requests for sick days and time off were denied, and she was subjected to greater demands than other employees). Plaintiff's facts do not meet this increased burden.

Plaintiff states that Santos excluded him from meetings, told him to quit his job, and "shut [him] off" or spoke to him less. None of these facts are sufficient to raise a genuine issue on constructive discharge. *See, e.g., Torrech-Hernandez v. Gen. Elec. Co.,* 519 F.3d 41, 51 (1st

Cir. 2008) (citing *Alfieri v. SYSCO Food Servs.-Syracuse*, 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001) (plaintiff's "subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination" not constructive discharge), and *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir.2002) (no constructive discharge where employee is told that continued employment status is contingent on future levels of performance and improvement)).  *Also see Thirkield v. Neary & Hunter OB/GYN, LLC*, 76 F. Supp. 3d 339, 352 (D. Mass. 2015), *app. dismissed* (Feb. 25, 2015) (no constructive discharge where coworkers gave plaintiff the "cold shoulder" or "bullying conduct" in retaliation for reporting harassment) (citing *Gawley v. Ind. Univ.,* 276 F.3d 301, 307, 316 (7th Cir. 2001) (finding that the "silent treatment" is "insufficiently severe to cause a reasonable person to quit") (additional citations omitted)), *and Jordan v. Forfeiture Support Assoc.*, 928 F. Supp. 2d 588, 607-08 (E.D.N.Y. 2013) (internal citations omitted) (threats to terminate employee not an adverse employment action). Santos' actions were not sufficient as a matter of law to cause a reasonable person to quit, and therefore Plaintiff will not be able to prove a constructive discharge.

On the undisputed facts, Plaintiff has not shown that he suffered an adverse employment action. Therefore, summary judgment for Defendant NBC is appropriate on the Title VII discrimination claims.

B.  Count II: Sex/Gender Harassment under Title VII against NBC

To prove a claim of hostile work environment sexual harassment under Title VII, Plaintiff must demonstrate:

> (1) that [he] is a member of a protected class; (2) that [he] was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an

> abusive work environment; (5) that sexually objectionable conduct was
> both objectively and subjectively offensive, such that a reasonable
> person would find it hostile or abusive and the victim in fact did perceive
> it to be so; and (6) that some basis for employer liability has been
> established.

*Crowley v. L. L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002). Application of this test requires an

assessment of the totality of the circumstances, including how frequent and severe the

discriminatory conduct was; whether it was physically threatening or humiliating, or merely

offensive; and whether it unreasonably interfered with an employee's work performance. *Id.*;

*Faragher*, 524 U.S. at 788.

Based on the undisputed facts, the first two criteria in *Crowley* are met. Plaintiff's claims

on the third prong are doubtful. Santos' "conduct may have engendered a nerve-wracking

environment, but not a nerve-wracking environment *based on gender*." *Ahern v. Shinseki*, 629

F.3d 49, 59 (1st Cir. 2010) (emphasis in original). Her comments that Plaintiff should be a

"cheerleader" or a "personal trainer" were gender-neutral, as were her suggestions that Plaintiff

should quit his job. However, the comment that Plaintiff was "not girly enough" is a direct attack

on Plaintiff's gender. Because of that, it will be assumed *arguendo* that Defendant Santos did act

from a gender animus.

However, on the fourth prong, Plaintiff's claim falters. At its worst, Santos' treatment of

Plaintiff was mild and limited. She never physically threatened or touched Plaintiff. Her

comments may have made Plaintiff feel awkward, but an employee's "discomfort is not the test."

*Ponte v. Steelcase, Inc.*, 741 F.3d 310, 320 (1st Cir. 2014) (citing *Oncale*, 523 U.S. at 81). The

facts here pale in comparison with cases in which harassment rose to the level protected by law.

*See, e.g.*, *Oncale*, 523 U.S. at 77 (worker on oil platform threatened with rape); *Marrero v. Goya*

21

*of P.R., Inc.*, 304 F.3d 7 (supervisor made humiliating sexual remarks and innuendos for over a year, discussed employee's appearance with coworkers, and subjected her to unwelcome full-body contact); *Crowley*, 303 F.3d at 397 (coworker constantly shadowed plaintiff, blocked her movements in the warehouse, stalked her outside of work, and eventually broke into her home). Instead, Santos' acts are comparable to cases in which courts have not found harassment. *See, e.g., Ponte*, 741 F.3d at 320 (insufficient discrimination where supervisor put his arm around plaintiff during two car rides); *Rivera-Martinez v. Commonwealth of P.R.*, 2007 WL 16069 *1 (1st Cir. 2007) (supervisor caressed plaintiff's forearm and used his hips to push her out of a room).

Plaintiff has also failed to adduce any facts to show that Santos' conduct affected his work. Being "unable to 'work effectively'" is relevant, but not essential, evidence as to the hostile work environment claim. *Gerald*, 707 F.3d at 19; *Lee-Crespo v. Schering-Plough Del Caribe Inc*., 354 F.3d 34, 46 (1st Cir. 2003). Plaintiff describes being excluded from meetings, becoming uncomfortable and anxious, having nightmares, and drinking alcohol to cope with his stress from work. (#64 at ¶¶ 130, 131.) However, he gave no indication that any of this affected his performance at work. (*Id*.) In his Affidavit, Plaintiff states that Ms. Santos' criticism "impeded my ability to perform my essential job responsibilities." (#64, exhibit 4, at ¶ 7.) However, he gives no explanation, and this bare assertion is contradicted by other facts. Plaintiff believed his work was strong; his sales were high, and other managers had praised him. (#64 at ¶¶ 116-17, 120.) Santos gave Plaintiff an evaluation of "meets expectations" at the end of March 2013, after his resignation. (##64, 66 at ¶ 72.) Because there is no disputed material fact that would change this situation, the analysis ends here.

### C.  Retaliation

#### 1.  Count III: Retaliation under Title VII against NBC

Plaintiff alleges that Santos retaliated against him after he complained about her. A retaliation claim requires a showing that (1) the plaintiff engaged in protected conduct; (2) he was subjected to an adverse employment action; and (3) there was a causal connection between the first and second elements. *Noviello,* 398 F.3d at 88 (internal citations omitted). Protected conduct includes complaining to one's supervisors. *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 175 (1st Cir. 2003); *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94-95 (1st Cir. 2006). The imposition of a hostile work environment can be an adverse employment action. *Noviello*, 398 F.3d at 89. "Title VII retaliation claims must be proved according to traditional principles of but-for causation… [requiring] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *and see Abril-Rivera v. Johnson,* 795 F.3d 245, 257 (1st Cir. 2015).

Here, Plaintiff engaged in protected conduct when he complained to Ingham on or around March 18-20, 2013. (##55, 64 at ¶ 64.)[15] He asserts that Santos retaliated against him by harassing him more aggressively and frequently, by telling him he should quit his job, and by excluding him from meetings. (##64, 66 at ¶¶ 126, 129-30.) Plaintiff said that Santos' "harassing comments increased in frequency" and that she "attacked his job performance unfairly." (#64 at ¶¶ 126-27.) He testified in deposition that "I wasn't included in meetings. She pretty much just

---

[15] Although Plaintiff asserts that he complained multiple times since late 2012, he only noticed Santos' conduct intensifying after this date. (#64 at ¶ 64.)

shut me off. There were more comments. And it was just uncomfortable." (#64, exhibit 3 at 287.) Defendants dispute that this happened. (#66 at ¶¶ 126-27.)

However, even if it were the case that Santos' behavior accelerated at that point, uncontroverted evidence shows that she did not know of Plaintiff's complaint at the time she supposedly was retaliating against him. (##55, 64 at ¶¶ 65-67; ##64, 66 at ¶ 126; #55, exhibit 24 (Alayna Ingham did not inform Santos that Plaintiff complained about her); #64, exhibit 46 at 106-07 (Santos testified that she was not aware that Plaintiff had complained about her).) Plaintiff assumed that Santos knew, but cannot point to any facts to show that she did. (##55, 64 at ¶ 65.) Therefore, any change in her treatment of Plaintiff could not have been motivated by his complaint, and it certainly cannot meet the "but-for" test outlined in *Nassar*.

Even if Santos had known of Plaintiff's complaint, her behavior did not rise to the level of retaliation against Plaintiff. Mere "rudeness or ostracism, by itself, is insufficient to support a hostile work environment claim"; to be actionable, the harassment must be "severe or pervasive." *Montalvo Rios v. Municipality of Guaynabo*, 743 F. Supp. 2d 62, 70-71 (D.P.R. 2010) (citing *Noviello*, 398 F.3d at 89). "For purposes of a Title VII retaliation claim, menacing looks, name calling, exclusion from meetings, or being shunned by co-workers does not constitute an adverse employment action. While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation." *Id.* at 71 (internal citations omitted.) Although Plaintiff asserts that Santos' conduct intensified after his complaint, the undisputed facts show only temporal correlation, not the necessary causation.

D. <u>Sex/Gender Discrimination under Mass. Gen. Laws c. 151B</u>

### 1.  Count IV against NBC

Evidence of an adverse employment action under Massachusetts law is similarly lacking. NBC is strictly liable for Santos' actions under Mass. Gen. Laws c. 151B. "As with Title VII, chapter 151B makes employers vicariously liable for hostile work environments created by supervisors… Unlike Title VII, however, chapter 151B does not afford employers any affirmative defenses to liability." *Rosemond v. Stop & Shop Supermarket Co*., 456 F. Supp. 2d 204, 215 (D. Mass. 2006) (citing *Noviello*, 398 F.3d at 95, and *College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, 400 Mass. 156 (1987)). Massachusetts courts use the four elements in *McDonnell Douglas* to interpret state law claims. *See, e.g., Sullivan v. Liberty Mut. Ins. Co*., 444 Mass. 34, 39 (2005) (adopting *McDonnell Douglas* burden-shifting scheme in analyzing claims under Mass. Gen. Laws c. 151B). Therefore, the Title VII analysis above also dispenses with Count IV.

### 2.  Count VII against Santos

Almost all of Plaintiff's allegations concern Defendant Santos. Aside from the incident in 2011 where Plaintiff complained about Patricia Lituri, no one else at NBC besides Santos made any inappropriate jokes or comments or harassed Plaintiff. (##55, 64 at ¶ 42.) The remaining accusations concern NBC company culture, including the task force investigating male retention rates and the decision to promote Tatiana Kidd instead of Plaintiff. Since the entirety of the evidence is insufficient to show an adverse employment action, the subset of evidence pertaining to Santos is also insufficient and Count VII also fails.

### E.  Sex/Gender Harassment under Mass. Gen. Laws c. 151B: Count V against NBC and Count VIII against Santos

As with discrimination claims, "[u]nder Mass. Gen. L. ch. 151B, § 4, an employer is vicariously liable for sexual harassment committed by a supervisor regardless of whether the employer is placed on notice of the discrimination." *Manno v. BJ's Wholesale Club*, 150 F. Supp. 2d 325, 332 (D. Mass. 2001) (citing *College-Town*, 400 Mass. at 167). All of Plaintiff's harassment claims concern Santos' conduct, so these two counts may be analyzed together.

Massachusetts law defines "sexual harassment" more narrowly than Title VII. Under the statute's plain language and relevant precedent, "sexual harassment" means

> sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when… such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Mass. Gen. Laws c. 151B, § 1, ¶ 18, *and see Salvi v. Suffolk Cnty. Sheriff's Dep't*, 67 Mass. App. Ct. 596, 603 (2006).

Negative comments about an employee's gender do not suffice to state a claim under this statute, in sharp contrast to situations that constitute harassment under Massachusetts law. Indeed, Mass. Gen. Laws c. 151B "does not mandate "clean language" in the work place." *Prader v. Leading Edge Products, Inc*., 39 Mass. App. Ct. 616, 619-20 (1996). Statements more objectively offensive than the one at issue here were not deemed actionable discrimination under Massachusetts law. *See Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120, 155 (D. Mass. 1996) (summary judgment granted for defendant who told plaintiff to wear a short skirt, called her hysterical, and stated she did not need a salary because she was married); *Bossi v. Town of Billerica*, No. 01-0890, 2001 WL 1660847, at *4 (Mass. Super. Dec. 21, 2001) (no harassment where defendant used "inappropriate and offensive" profanity and publicly demeaned plaintiff based on gender); *Perini/Kiewit/Cashman v. Massachusetts Comm'n Against*

*Discrimination*, No. 045322, 2006 WL 2423630, at *6 (Mass. Super. July 27, 2006) (no harassment where defendant's comments to plaintiff included "never should have women in construction, damn women" and "dumb bitch").

Even assuming *arguendo* that Santos' actions could be considered sufficiently sexual under the statute, the facts Plaintiff has produced do not suggest that they had any effect whatsoever on his work. *Cf. Windross v. Vill. Auto. Grp., Inc*., 71 Mass. App. Ct. 861, 869 (2008) (hostile work environment claim is "dependent upon a finding that the abusive conduct was 'sufficiently severe and pervasive to interfere with a reasonable person's work performance'"). Factual scenarios that have met that standard include *Melnychenko v. 84 Lumber Co*., 424 Mass. 285, 290 (1997) (defendant grabbed plaintiffs by their genitals and buttocks, touched them "everywhere," exposed himself, requested and simulated sexual acts, and made public announcements about plaintiffs' sexual activity); *College-Town,* 400 Mass. 156 (defendant made offensive comments and sexual propositions, and committed unwanted touching); and *Trinh v. Gentle Communications, LLC*, 71 Mass. App. Ct. 368, 371 (2008) (defendant asked to see employee's breasts, made sexually suggestive comments, and rubbed his genitals against her). In this case, the undisputed facts do not support Plaintiff's Massachusetts statutory claims for sex/gender harassment.

  F.  Retaliation under Mass. Gen. Laws c. 151B: Count VI against NBC and Count IX against Santos

Because all of Plaintiff's retaliation allegations concern Santos, and NBC is liable for her behavior, the claims against NBC and Santos may be analyzed together. Massachusetts uses the three prongs outlined in *Noviello*. *See Mole v. Univ. of Mass.,* 442 Mass. 582, 592 (2004). "At a minimum, there must be competent evidence that the alleged retaliator knew of the plaintiff's

protected activity and that a retaliatory motive played a part in the adverse employment action alleged." *Bossi*, 2001 WL 1660847 at *5 (internal citation omitted). For the reasons outlined above, the undisputed facts cannot support a claim for retaliation under state law.

## IV. Conclusion

Considering the totality of the circumstances and the undisputed facts in this case, I find that no genuine issue of material fact exists on Plaintiff's claims, and that Defendants are entitled to the entry of judgment in their favor. Therefore, I RECOMMEND that the Defendants' Motion for Summary Judgment (#54) be ALLOWED on all counts.[16]

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge

November 13, 2015.

---

[16] The parties are hereby advised that any party who objects to this recommendations must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603(1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).